**MULTIFASTENER CORPORATION, a Michigan corporation, Plaintiff,**

**v.**

**MacLEAN–FOGG COMPANY, a Delaware corporation, Defendant.**

Civ. A. No. 81–70456.

United States District Court,
E.D. Michigan, S.D.

Sept. 6, 1983.

**420**

Cullen, Sloman, Cantor, Grauer, Scott & Rutherford by Raymond E. Scott, Ralph T. Rader, Detroit, Mich., for plaintiff.

Mason, Kolehmainen, Rathburn & Wyss by Philip M. Kolehmainen, Joseph Krieger, Chicago, Ill., for defendant.

## OPINION

GILMORE, District Judge.

Plaintiff Multifastener Corporation brings this action alleging that defendant MacLean-Fogg Company has infringed six patents owned by plaintiff and engaged in unfair competition by using a trademark that is confusingly similar to plaintiff's trademark.

## THE PATENT INFRINGEMENT CLAIM

The litigation involves a product known as a pierce nut, which is a metal fastener that is installed in a panel of sheet metal. It is used principally by the automotive industry. Once a pierce nut is affixed to a panel of metal, it actually becomes part of the panel. Manufacturers can then use automated assembly systems to bolt parts to the metal panels.

Pierce nuts are typically installed by a press. When a pierce nut is installed, a portion of the nut, known as the pilot, punches a hole through the metal panel. The nut is then affixed to the metal panel when a die button deforms the metal of the panel or the nut to create an interlock.

Plaintiff Multifastener, along with its licensees, and defendant MacLean-Fogg are competitors in the business of selling, designing, developing, and marketing pierce nuts and the tools for installing them. The patents involved in this suit concern various methods for attaching pierce nuts to a panel of metal and the tools (or die buttons) used to install the nuts. Both plaintiff and defendant offer fastener systems known as "flush mounted" or "direct clamp" pierce nut and panel assemblies. Both of these assemblies feature a nut with a rectangular pilot, a threaded aperture through the center of the nut, and flanges on two sides of the pilot. The flanges contain grooves. Portions of the panel metal are displaced into these grooves when the nut is attached to the panel.

Both plaintiff and defendant offer (or have offered) "severed" and "nonsevered" (or integral and continuous) versions of these nut and panel assemblies. (See discussion *infra*).

Plaintiff's current nut and panel assembly is known as the "Hi-Stress" nut and panel assembly, and defendant's product is called the "Hi-Clamp" assembly. Representations of defendant's and plaintiff's current nonsevered installations are set forth as Appendix A.

### The Patents

There are six patents involved in this suit. All are owned by plaintiff. The patents can be conveniently divided into three groups according to their subject. The first group of patents cover methods of clinching

or staking the *pilot portion of the nut* in order to secure the nut on the panel. These patents include the following:

1. P.E. Double et al. Patent No. 3,091,843 (hereinafter referred to as the '843 patent). This patent claims a method of securing a nut to a panel which includes "radiusing" the corners of the pilot portion of the nut.[1] Although this patent does not specifically cover plaintiff's current Hi-Stress nut, plaintiff claims that the patent is infringed by defendant's method of clinching the corners of its Hi-Clamp nut.

2. P.E. Double Patent No. 3,299,500 (hereinafter referred to as the '500 patent). This patent includes two claims directed to a method of assembling a nut on a panel by piercing the nut through the panel, displacing a portion of the panel into grooves on the nut, and, finally, deforming or staking the nut pilot to overlie the groove, forming a mechanical interlock.

3. P.E. Double Patent No. 3,314,138 (hereinafter referred to as the '138 patent). This patent claims two methods of assembling a nut on a panel. The method requires piercing the pilot of the nut through the panel, deforming the panel on two sides into grooves in the nut, and clinching or deforming the pilot outwardly on the remaining two sides to overlie the panel.

The next group of patents cover a method of securing the nut on the panel by severing certain portions of the panel and then deforming this severed panel metal into grooves contained on the nut. The final product is called a "severed" nut and panel assembly.

4. P.E. Double et al. Patent No. 3,315,345 (the '345 patent). This patent contains six claims. Claims 1, 3, and 4 are directed to a method of securing a nut to a panel by severing portions of the panel overlying the grooves in the nut and displacing this severed panel metal into the grooves. Claims 2, 5, and 6 describe a die button used in securing a nut to a panel.

5. P.E. Double et al. Patent No. 3,439,723 (the '723 patent). This patent contains four claims describing nut and panel assemblies in which 1) the nut pilot extends through the panel metal, 2) the nut has flanges (shoulders) which support the panel, 3) the nut has grooves on opposed sides of the pilot which have restricted openings, and 4) portions of the panel are severed and are deformed into the groove openings.

The last patent in the suit describes a method of securing a nut to a panel by deforming panel metal into grooves on the nut without severing the panel metal. This is plaintiff's current commercial nut and panel assembly, and it is referred to as the "integral and continuous, or nonsevered, nut and panel assembly."

6. Steward Patent No. 3,648,747 (the '747 patent). Claim 1 of this patent describes a method of securing a nut to a panel without severing portions of the panel metal. In this method, the nut has a rectangular pilot portion with flanges extending outward from opposing sides of the pilot. The flanges contain grooves which have restricted openings. These restricted openings are defined by the inner and outer sidewalls of the grooves. The nut pilot pierces the panel. The panel is attached to the nut in two stages: first, portions of the panel are deformed around the outer edges of the grooves, and second, portions of the panel are deformed to "engage substantially the entire bottom and inner sidewalls of said grooves." Thus, the panel metal which is deformed into the nut grooves maintains a continuous connection with the rest of the panel metal.

Claim 2 of the '747 patent is not at issue in this case.

In sum, the first three patents in suit describe a method of securing the nut to the panel of metal by deforming the metal of the nut in various ways. The next two patents, the "severing" patents, secure the nut to the panel by severing panel metal and deforming that metal into grooves on the nut. These grooves have a restricted opening—the mouth of the groove is narrower than the bottom. Grooves with this

1. Radiusing refers to an operation designed to round off sharp corners.

configuration are known as reentrant grooves. When the severed panel metal is deformed into the grooves, its width becomes greater than the width of the groove opening. This creates an interlock between the nut and the panel. Finally, the integral and continuous patent defines a method of securing the nut to the panel by deforming panel metal against the walls and bottom of groove on the nut without severing the panel metal. Again, the grooves have restricted, or reentrant, openings. This method of securing the panel to the nut involves two stages. First, the panel metal is captured and deformed around the outer groove wall and onto the bottom of the groove. Next, the panel metal is deformed against the bottom groove wall and the inner groove wall.

### Defendant's Products

Defendant has marketed two different pierce nut and panel systems that plaintiff claims infringe on all of the above patents.[2] The first assembly, which will be called defendant's "original" or severed Hi-Clamp nut, featured a rectangular pilot, a threaded aperture, and flanges on two sides. Rectangular grooves were located on the flanged sides of the nut. The die button sold in conjunction with the defendant's original nut caused the metal panel to sever along the outer edges of the groove in the nut. The corners of the pilot were then clinched to retain the severed panel in the grooves. Plaintiff claims that this assembly infringes the first five patents listed above. In other words, plaintiff alleges 1) that defendant's method of installing its original nut and panel assembly infringes the '723 patent and claims 1 and 4 of the '345 patent because panel metal is severed when the nut is attached to the panel, and 2) that defendant's original nut and panel assembly infringes the '843 patent, claim 1 of the '500 patent, and the '138 patent because the corners of the nut pilot are clinched during attachment.

Defendant's second product, the current nonsevered version of the Hi-Clamp nut and panel assembly, features a nut with a rectangular pilot, a threaded aperture, and flanges on two sides of the pilot. The flanged sides of the nut contain grooves. The outer wall of each groove inclines inwardly at an angle of 10 degrees, the inner side walls of the grooves are straight. The die button used in conjunction with this nut does not sever the panel metal. Instead, the die button pushes panel metal into the two grooves to form an interlock between the nut and panel. The die button also deforms the corners of the pilot to make corner clinches. Plaintiff claims that this nonsevered Hi-Clamp nut and panel assembly infringes the '747 (or integral and continuous) patent because it captures panel metal and deforms it into grooves having restricted openings without severing the panel, and 2) that this nonsevered nut infringes the '843, '500, and '138 patents because the corners of the nut pilot are clinched during installation.

Finally, plaintiff claims that defendant's die button for installing both the severed and the nonsevered version of the "Hi-Clamp" nuts infringe the die button claims (claims 2 and 5) of the '345 patent.

Defendant contends, first, that all of the patents (except the '723 patent and claims 1 and 4 of the '345 patent) are invalid. Second, defendant asserts that, even if these patents are valid, they are not infringed by defendant's products. Third, defendant contends that one of the patents in suit, the '747 patent, was erroneously issued with the wrong claim by the patent office and is therefore a nullity. Finally, defendant asserts that the '747 patent is unenforceable because plaintiff allegedly failed to comply with its duty of candor and good faith during the prosecution of the patent.

### FACTUAL BACKGROUND

Plaintiff developed its first pierce nut, called the Universal pierce nut, in the early

---

2. The parties do not actually market completed assemblies. They sell nuts and installation tooling, and service customers. The completed assembly only exists in another product—e.g. an automobile.

1950s. In order to mount this universal-type nut on a panel of metal, the panel had to be embossed. This installation was not entirely satisfactory because the embossure tended to collapse when a bolt was attached to the assembly.

In an effort to improve the performance of its nut and panel assembly system, plaintiff developed the flush mounted Hi-Stress pierce nut in the early 1960s. This nut includes flanged portions on opposed sides of the pilot which support and interlock the nut onto the panel. When the nut is assembled to the panel, the clamp load resulting from the attachment of a bolt bears on the flange surfaces. Thus, the Hi-Stress nut and panel assembly had greater integrity than the Universal nut and panel assembly.

From 1963 to 1969, plaintiff marketed an assembly and installation tooling using this Hi-Stress nut, which was known as the "severed" Hi-Stress nut and panel assembly. The system is called the "severed" assembly because the panel metal is severed in certain locations when it is attached to the pierce nut.

This severed nut and panel assembly had some problems. For example, the severed assembly had inadequate retention in certain panel metals and it could only be used with a limited range of metal thicknesses. (See Tr. vol. II at 93–94.) The severed nut and panel assembly also had a problem known as "die sticking"—the panel assembly would stick to the die button. In addition, the severed version of the Hi-Stress nut and panel assembly failed certain stress tests.

In response to the need for greater nut retention and strength of the assembly, plaintiff developed a new Hi-Stress nut and panel assembly—the '747 patent. Tests conducted in 1970 revealed that the integral and continuous nut and panel assembly eliminated the problems found in the severed version. The integral and continuous assembly eliminated die sticking, allowed an increase in the range of panel metals, and approximately doubled the retention of the nut to the panel.

The integral and continuous nut and panel assembly did not require any modification to the configuration of the Hi-Stress nut. The only modification required to create this structure was a change in the clinching lips of the die button.

John Steward, the inventor of the integral and continuous assembly, testified that this method of attachment was contrary to the teaching of the prior art.

The integral and continuous assembly became plaintiff's standard installation in May, 1970.

Defendant entered the flush-mounted pierce nut market when it sold Hi-Clamp nuts and installation tooling to form the original severed Hi-Claim assembly in the summer of 1980. Subsequently, defendant modified both its die button and its nut to eliminate severing and create an integral and continuous nut and panel installation. The die button was modified by angling and thinning the clinching lips (vol. VIII at 95–97). The nut was modified by inclining the outer groove walls at an angle of ten degrees, thus forming a reentrant groove.

### ADMINISTRATIVE ERROR

Defendant asserts that the patent office made a clerical error and printed the wrong language in claim 1 of the '747 patent. Specifically, defendant maintains that the claim that was ultimately printed was actually rejected by the patent office and that when the '747 patent was finally approved, after some amendments were filed, the patent examiner really intended to issue a claim that included the language of the last two amendments to the application. Defendant contends that this alleged error nullifies the patent. In other words, according to defendant, claim 1 of the '747 patent has no legal effect.

A review of the file wrapper reveals the following events. The "continuation application" for the patent, entitled "Nut and Panel Assembly and Method of Making Same" was filed in October 1969. The application included three claims. The patent examiner rejected the claims in December of 1970.

The inventor, John Steward, then filed amendment A on April 20, 1970. Claim 3 of amendment A is identical to claim 1 of the patent that was ultimately issued, except that the word "convergent", which appears in amendment A, does not appear in the patent as issued. Amendment A was entered by the patent examiner, but the entire application was rejected on May 21, 1971. One of the grounds for rejection was that the prior art included embodiments having "convergent" inner and outer walls.

Plaintiff then filed amendment B on June 11, 1971. Since amendment B was filed after a final rejection of the patent application, it could only be entered if it met the requirements of Patent Office Rule 116, 37 C.F.R. § 1.116. The patent examiner issued an "advisory action" on July 13, 1971 refusing to enter amendment B. The patent examiner wrote "do not enter, 7–7–71" on the first page of amendment B.

On July 16, 1971, plaintiff filed amendment C. This amendment cancelled the original claims 1 and 2 of the patent, added claim 4 (claim 4 became claim 2 in the patent and is not at issue in this case), and made one minor change in claim 3. It is important to note that the only change in claim 3 (which became claim 1 and is the claim at issue in this case), was in line 15; the word "and" was substituted for the word "said". The amendment also contained a detailed affidavit by Thomas Pouch, the chief engineer at Multifastener, which documented the improved strength of the nut and panel assembly described in claim 3.

The patent examiner marked "approved for entry 8/13/71" on amendment C. The examiner then marked amendment B "approved for entry" on August 23, 1971. The examiner mailed a communication to the applicant on August 25, 1971 allowing the claims in the '747 patent, in view of the communications filed June 11 and July 16, 1971 (amendments B and C).

As noted above, the claim that was ultimately printed as claim 1 appeared in amendment A, except that the word convergent was deleted.

Defendant contends that the patent office should have printed amendment B (as supplemented by amendment C) as the language of claim 1. In support of its claim that the examiner issued the "Amendment A" version of claim 1 by mistake, defendant offered the testimony of Donald W. Banner, a former Commissioner of Patents and Trademarks. Mr. Banner testified that, when the patent examiner allowed the entry of amendments B and C, earlier versions of claim 1 were cancelled. Thus, Mr. Banner concluded that the examiner really approved the claim as written in amendments B and C, and through some clerical error amendment A (excluding the word convergent) was printed. Mr. Banner testified that the printer decides what to print by looking at the written record. The printer does not print anything that was stricken by having a line drawn through it. Mr. Banner testified that amendment B was not printed because it had a line through it. He testified that he "presume[d]" a clerk drew the line. Mr. Banner also testified that there is no official document deleting the word "convergent" from amendment A, although the original document had pencil marks around that word that the printer might have interpreted as an instruction to delete.

Plaintiff urges this Court to examine the chronology of events carefully. Plaintiff notes that amendment C was entered before amendment B. Thus, when amendment C was entered, the only other version of printed claim 1, which had already been entered, was the version contained in amendment A. Since amendment C contained only a minor change in the claim, plaintiff concludes that the examiner decided to allow the claim found in amendment A (with the minor amendment of C) based on the evidence and affidavit presented in conjunction with amendment C. This contradicts Mr. Banner's conclusion that the entry of B and C automatically cancelled A. Plaintiff asserts that the evidence in the file wrapper shows that the examiner did not intend to allow the language of the claim as found in amendment B because

that language was stricken. Plaintiff argues that when the examiner wrote "approved for entry" on amendment B on August 23, he intended only to enter the remarks and arguments that were attached to the amendment.

■ Defendants' allegation of administrative error requires this Court to determine the intent of the examiner. In making this determination, this Court must start with the proposition that every patent is accorded a presumption of validity. Defendant concedes that it has the burden to persuade the Court that the examiner never intended to allow claim 1 of the '747 patent as printed. Defendant's expert, Mr. Banner, has offered a reasonable explanation of the documents in the file wrapper. But Mr. Banner can really only speculate as to the examiner's intentions based on his experience and the usual policies of the patent office. Mr. Banner himself noted that he "presume[d]" that a clerk erroneously drew the line through amendment B, which caused the printer to delete that language. It is certainly possible that the examiner himself drew the line or directed the clerk to do so. The documents in the file wrapper simply do not give any clear indication of the examiner's intentions. Plaintiff has offered a plausible explanation that is in accordance with the evidence in the file wrapper. Therefore, because an independent review of the documents does not clearly show that the examiner never intended to issue the patent claim as printed, and defendant has been unable to offer any concrete evidence of the examiner's intent, and because the patent is presumed to be valid, the Court finds that the defendant has not carried its burden of proving that the patent, as issued, is invalid or is a nullity due to administrative error.

## VALIDITY

There are three legal requirements for a valid patent: utility, novelty, and nonobviousness. *General Motors Corp. v. Toyota Motor Co. Ltd.,* 667 F.2d 504 (6th Cir.1981), *cert. denied* 456 U.S. 937, 102 S.Ct. 1994, 72 L.Ed.2d 457 (1982). Defendant alleges that

four of the patents in suit are invalid. Specifically, defendant contends that the '747, '843, '138, and '500 patents are invalid because they were obvious. In addition, defendant claims that the '747 patent is invalid because it was not novel.

As noted above, every patent carries a presumption of validity. The burden is on defendant to establish its claims of invalidity by clear and convincing evidence. *Armco Inc. v. Republic Steel Corp.,* 707 F.2d 886 (6th Cir.1983).

### a. *Novelty*—The '747 patent

The defense of lack of novelty is derived from 35 U.S.C. § 102, which reads in part:

A person shall be entitled to a patent unless—(a) the invention was known or used by others ... before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication ... more than one year prior to the date of the application for patent in the United States, or

. . . . .

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent ...

■ Under this statute, a patent lacks novelty if it has been anticipated by a prior device. A patent is anticipated if all of its elements, or their equivalents, are found in a single prior art structure where they do substantially the same work in the same way. *See Tee-Pak, Inc. v. St. Regis Paper Company,* 491 F.2d 1193 (6th Cir.1974).

Defendant contends that the '747 patent was anticipated by an illustration and article that appeared in two issues of a magazine called *Machine Design,* and by a Fabristeel brochure. All of these publications were dated more than one year before the filing date of the patent.

The publications contain illustrations that appear to be cross sections of a nut and

panel assembly [3] in which the panel metal is partially inside the grooves of the nut. Defendant contends that these illustrations depict a cross section of the integral and continuous nut and panel assembly that is claimed in the '747 patent. In addition, defendant asserts that the text discloses each element of the assembly. Plaintiff, on the other hand, contends that this illustration was really meant to depict a compound cross section of the severed nut and panel assembly and that the integral and continuous version of the assembly was not even conceived at the time of the publications.

 A review of the publications in question reveals that the text and illustrations really only give general information about pierce nuts and do not disclose the type of assembly claimed in the '747 patent. The publications describe what pierce nuts are, what they can be used for, and what their advantages are. The publications do not give any specifications regarding the method of attachment. The illustrations do not indicate the shape of the nut or show how the panel is pierced and captured. In fact, the *Machine Design* article does not even concentrate on Hi-Stress nuts. Defendant's expert admitted that a person skilled in the fastener art at the time of the first *Machine Design* article would not expect to design a fastener based on the information in the article. Defendant's expert also indicated in cross examination that one could not determine whether certain elements of the '747 patent were present in the illustration.

In sum, the publications really only contain general statements about pierce nuts. The vague sketches do not really show a nut and panel assembly having all of the elements of the '747 patent. The publications, therefore, do not give the kind of information that would lead this Court to find that the '747 patent lacks novelty.

Defendant next contends that the '747 patent, if construed broadly, was anticipated by the '138 patent. The '138 patent was cited by the patent office when the '747

patent was considered. Both plaintiff's and defendant's experts appeared to agree that the '138 patent did not disclose the elements of claim 1 of the '747 patent because the configuration of the nut grooves in the two assemblies differed. (Tr. Vol. V at 34; Tr. Vol. X at 41) In addition, defendant's expert testified that the disclosures in the *Machine Design* article, discussed above, were more relevant to the '747 patent than the disclosures in the '138 patent. This Court therefore concludes that the '138 patent does not contain all the elements of the '747 patent and cannot be used to establish a lack of novelty.

Finally, defendant contends that the '747 patent was anticipated by the '500 patent. Specifically, defendant claims that the '747 patent is anticipated by the nut and panel assembly shown in sheet 2 of the '500 patent.[4]

Defendant argues that if the '747 patent is interpreted to define the Hi-Clamp nut and panel assembly (in which the nut groove has only one inclined wall and portions of the nut pilot are deformed), then each and every element of claim 1 of the '747 patent is found in the '500 patent.

There are some important differences between the nut and panel assembly embodied on sheet 2 and the structure contemplated in claim 1 of the '747 patent. Sheet 2 of the '500 patent shows what appears to be a cross section of a nut and panel assembly. The nut has grooves on opposed sides of the pilot. The inner groove walls are straight and vertical. The outer groove walls have a projection (or "ear") that creates a restricted opening. Thus, the grooves can be defined as "reentrant grooves". When this nut is assembled to a panel, the die button displaces a portion of the panel into the groove. The metal is supposed to flow into the restricted opening beneath the overhanging ledge. Then the die button slices a portion of metal from the nut pilot. This pilot metal is displaced to overlie the inner wall of the groove.

3. See Appendix B.

4. See Appendix C.

The nut and panel assembly in claim 1 of the '747 patent has a different configuration than the embodiment shown on sheet 2 of the '500 patent. The '747 patent shows an assembly using a nut that has groove walls that are relatively inclined in contrast to assembly in the '500 patent, which has a projection on the outer groove wall. Although defendant's expert testified that the "stepped" groove wall of the '500 patent is equivalent to the inclined groove wall of the '747 patent, plaintiff's expert, John Steward, testified that it is the structure of the groove of the '747 patent that makes the assembly workable. Mr. Steward testified that the groove configuration found in the '500 patent was unworkable. He stated that the panel metal and the projection on the groove wall actually worked against each other; when an installation was attempted, the die button bent the projection. Mr. Steward testified that the '747 patent creates a workable assembly only because the groove walls *extend to the surface of the nut.* He stated that the embodiment of the '500 patent contradicts the teaching of the '747 patent. Thus, the shape of the groove walls is an essential element of claim 1 of the '747 patent. The stepped groove wall of the '500 patent cannot be deemed the equivalent of the inclined groove walls of the '747 patent.

Thus, there is a distinct difference between the assembly disclosed in the '500 patent and that claimed in the '747 patent. There is a clear difference in the shape of the nut grooves and in the relationship between the nut grooves and the capturing of the panel metal. In addition, both defendant's and plaintiff's experts testified that the '500 patent was less relevant to the '747 patent than the prior art cited by the patent examiner. (Tr. Vol. IV at 32–33; Vol. VII at 111.) Thus, this Court must conclude that the '500 patent does not encompass all the elements of the '747 patent. The '747 patent is not anticipated by the '500 patent, and the '500 patent cannot be used to show lack of novelty.

### b. *Obviousness*

Under 35 U.S.C. § 103, a patent that is "obvious" at the time of the invention to a person skilled in the art is invalid. 35 U.S.C. § 103 states:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title [35 U.S.C. § 102], if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

To determine whether a patent meets the requirement of nonobviousness, the Court must inquire into three primary factors: 1) the scope and content of the prior art, 2) the differences between the prior art and the claims at issue, and 3) the level of ordinary skill in the prior art. Several secondary considerations, such as commercial success, long felt but unsolved needs, and failure of others, might also be relevant. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

It is important to emphasize that one cannot rely on hindsight in determining whether the invention was obvious. The parties cannot use the patent in suit as a guide in evaluating the prior art. *Orthopedic Equipment Co. v. United States,* 702 F.2d 1005 (C.A.F.C.1983).

Again, because of the presumption of validity, "the burden is on the party challenging validity to demonstrate exactly what prior art is pertinent and *what level of skill is possessed by the ordinary worker in that art." Armco, Inc. v. Republic Steel Corp.,* 707 F.2d at 889. (emphasis added).

### 1. *The level of ordinary skill in the art and the experts*

There is scant evidence in the record indicating the level of skill of the ordinary worker in the art at the time of the inventions (1960–1967). Mr. Steward, plaintiff's expert, testified that the technical fields of mechanical engineering and tooling engineering were closely related to pierce nuts.

He also testified that the technical field of metal forming had some relation to pierce nuts. Defendant's expert, Professor Quackenbush, testified that the engineers employed in the automotive industry from 1960 to 1967 often had technical engineering degrees. There is no evidence in the record showing the level of knowledge of those skilled in the art of designing and installing fasteners, and what they were able to do.

The lack of factual information regarding the level of ordinary skill in the art at the time of the inventions makes it very difficult for this Court to determine whether the patents were obvious. This Court could conclude that the defendant has failed to meet its burden. *Armco, Inc. v. Republic Steel Corp., supra.* The record does contain, however, evidence of the scope and content of the prior art and its relationship to the patents in suit that enables this Court to make findings regarding obviousness.

Plaintiff's principal expert witness, John Steward, spent his entire professional life designing and developing pierce nuts and other fasteners. He is the inventor of the last patent in suit. Mr. Steward has taken some engineering courses and has been involved in technical seminars. Mr. Steward was an extremely credible witness. Because of Mr. Steward's credibility and his vast experience with pierce nuts at the time of the claimed inventions, the Court places considerable weight on his testimony.

Defendant's principal expert witness, Professor Quackenbush, is a Professor of Mechanical Engineering and Assistant Dean of the College of Engineering at the University of Michigan. Professor Quackenbush has taught courses on the mechanical behavior of materials. Although he had some practical experience with metal forming operations, Professor Quackenbush testified that he never saw a flush mounted pierce nut until the trial. He also testified that he was not an expert in the design of

fasteners or pierce nuts. Professor Quackenbush testified that he has expertise relating to pierce nut installations because the expertise required to install pierce nuts is contained in the body of general knowledge relating to the mechanics of metal forming. Although Professor Quackenbush is undoubtedly an expert in engineering, he did not have extensive experience with pierce nuts or other fasteners at the time of the inventions. The Court therefore finds his testimony regarding obviousness less persuasive than that of Mr. Steward.

### 2. The Prior Art

The defendant has alleged that four of the patents in suit are invalid because they were obvious in light of the prior art. Each patent will be discussed separately.

#### a. The '747 Patent

Defendant contends that the '747 patent was rendered obvious by the following prior art: 1) the *Machine Design* articles discussed above, 2) the '500 patent, and 3) plaintiff's severed version of the Hi-Stress nut and panel assembly.

#### 1. The Machine Design Article

As noted earlier, the *Machine Design* article contains an illustration of what appears to be a cross section of a nut and panel assembly. The article also gives general information regarding pierce nuts and other fasteners.

Defendant's expert, Professor Quackenbush, testified that the integral and continuous nut and panel assembly disclosed in claim 1 of the '747 patent would have been obvious to one skilled in the art after viewing the *Machine Design* article. He indicated that the only difference between the '747 patent and the assembly depicted in the article was that the illustration in the article did not show the panel metal substantially filling the nut grooves.[5] He stated that the article teaches that the metal secured in the undercut is for retention and

---

5. Claim 1 of the '747 patent states that the panel metal "engage[s] substantially the entire

bottom and inner side walls of [the] grooves".

that one skilled in the art would know, after reading the article, that, in order to improve nut retention, more metal had to be deformed into the groove. He testified that a person of ordinary skill would have to modify the die button to deform more metal into the nut groove. On cross examination, however, Professor Quackenbush admitted that a person skilled in the fastener art in 1963 would not expect to design a fastener based on the information disclosed in the *Machine Design* article. (Vol. XII at 23).

Plaintiff's expert, John Steward, testified at length that the integral and continuous assembly disclosed in the '747 patent would not have been obvious to one skilled in the art at the time of the *Machine Design* article and at the time of the other inventions. Mr. Steward had been working with the design and installation of pierce nuts for several years before he developed the integral and continuous installation. Although, with the benefit of hindsight, it may seem obvious that an effective assembly could be achieved if panel metal is deformed into the nut groove, Mr. Steward testified that the integral and continuous assembly was contrary to the teachings of the prior art. He testified that early attempts to form a flush-mounted pierce nut failed because the metal would not stay in the grooves. The '747 patent produced a workable assembly because it disclosed a structure that is capable of capturing and retaining the panel metal in the nut grooves. Steward testified that the '747 patent discloses an entirely new means of assembling the nut to the panel. The panel metal is captured by the die button and deformed to engage the outer groove wall. Then the panel metal is further deformed to engage the bottom and inner groove walls in an L-shaped configuration. This creates a fulcrum effect that provides strength of retention.

Although the only modification necessary to form this integral and continuous assembly involved a change in the clinching lips of the die button, Mr. Steward testified that, based on the prior teachings, he anticipated that such a modification would result in die button breakage. Mr. Steward testi-

fied that the illustration in the *Machine Design* article would not make the '747 patent obvious to one skilled in the art because the illustration shows the panel metal contacting the outer edge of the groove only at the corner. Mr. Steward testified that the *Machine Design* assembly does not disclose the two-stage deformation and capturing of panel metal that is the basis of the '747 patent.

This Court therefore concludes that the disclosures of the *Machine Design* article did not make the '747 patent obvious to one skilled in the art at the time.

### 2. The '500 Patent and the "Severing" Installations

Defendant contends that the teaching of the '500 patent made the '747 patent obvious to one skilled in the art. As indicated above, the '500 patent covers a nut and panel assembly in which one wall of the nut grooves is "stepped", and portions of the nut pilot are deformed to overlie the panel metal that is displaced into the groove.

Defendant's expert testified that a stepped groove wall and an inclined groove wall have essentially the same function. He further stated that the major difference between the '500 patent and the '747 patent is that the '500 patent disclosed an assembly that includes pilot deformation. Professor Quackenbush testified that the die button could be modified to eliminate the pilot deformation in the assembly disclosed in the '500 patent and that such a modification would have been obvious to one skilled in the art.

Mr. Steward testified that the '747 patent was not rendered obvious by the disclosures of the '500 patent. He indicated that the '500 patent did not teach the type of groove configuration that would allow adequate retention in an integral and continuous nut and panel assembly. He further stated that the '500 patent did not disclose the type of two-stage capturing that is necessary to construct a workable structure, as defined in the '747 patent. Further, as noted earlier, both defendant's and plain-

tiff's experts testified that the '500 patent was less relevant to the '747 patent than was the prior art cited by the examiner.

Finally, defendant claims that the '747 patent would have been obvious to one skilled in the art in view of plaintiff's severed nut and panel assemblies. In the severed Hi-Stress nut and panel assembly, portions of the panel metal are severed and displaced into the nut groove.

Defendant contends that the only difference between the severed installation and the integral and continuous installation is that in the severed version portions of the panel metal are severed. The only change necessary to produce the integral and continuous assembly was a change in the clinching lips of the die button. Defendant argues that one with ordinary skill in the art could have modified the clinching lips of the die button to produce an integral and continuous attachment.

As noted above, Mr. Steward testified at length that the integral and continuous method of attachment was contrary to the teachings of the prior art. He further testified that the advantages of the integral and continuous version were unexpected.

Mr. Steward stated that the severing installations did not make the claim in the '747 patent obvious to one skilled in the art. He testified that the technique disclosed in the '747 patent was entirely different than the technique of the severed assembly.

Plaintiff's testimony regarding commercial success and need in the industry supports the conclusion that the prior art cited by defendant did not make the claim of the '747 patent obvious to one skilled in the art. Plaintiff produced evidence of the sales of pierce nuts. The evidence shows that the integral and continuous assembly was a commercial success as compared with the severed version.[6] Mr. Steward testified that the plaintiff would have been excluded from the fastener market if it had not

developed the integral and continuous assembly because the severed assembly had failed stress tests.

In sum, the testimony of plaintiff's expert regarding the development of the integral and continuous assembly and the fact that it contradicted the teachings of the prior art, along with the evidence of commercial success, establishes that claim 1 of the '747 patent was not obvious in view of the prior art cited by defendant. Thus, this Court concludes that claim 1 discloses a valid and enforceable patent.

### b. The '843 Patent

Defendant contends that the '843 patent was obvious to one skilled in the art in view of the Strain and Newcomb patents, which were cited as prior art. (ex. 266, tabs O and Q)[7]

The '843 patent discloses a method of assembling a nut to a panel in which the corners of the pilot portion of the nut are radiused during installation. As the nut is installed, the corners of the pilot are rounded by the action of the die button. See Ex. 1 and 275.

The patent office examiner cited both prior art patents when he considered the '843 patent. Mr. Steward, plaintiff's expert, testified that the '843 patent would not have been obvious to one skilled in the art in view of the Newcomb and Strain patents. He stated that the Strain patent did not suggest radiusing for relieving the severe strain at the sharp corners of the pilot. He testified that the Newcomb patent did not make provisions for radiusing the corners and that the configuration tended to fracture the assembly at the corners, thus reducing the integrity of the fastener.

Defendant's expert agreed that, in his opinion, the Strain and Newcomb patents did not make the claims of the '843 patent obvious to one skilled in the art because neither patent teaches the method step of radiusing the nut pilot. However, defend-

6. See Appendix D1 and D2.

7. Defendant claims that the '843 patent was obvious in view of the prior art only if it is read

broadly enough to be considered infringed by defendant's product.

ant's expert did state that, if the '843 patent could be read to cover the type of assembly used by defendant, then he would conclude that there is no difference between the combined claims of Newcomb and Strain and the '843 patent.

Since both experts agree that the claims of the prior art did not cover the method of radiusing the pilot corners that is claimed in the '843 patent, the Court finds that the '843 patent is not obvious in view of the prior art.

### c. The '138 Patent

Defendant argues that the claims of the '138 patent were obvious to one skilled in the art in view of the prior art found in the Strain and Newcomb patents (patent nos. 2,707,322 and 2,750,660). The Newcomb patent was cited by the examiner when the '138 patent was allowed.

The '138 patent disclosed an installation in which the two nonflanged sides of the pilot portion of the nut are staked outwardly to overlie the panel metal.

Mr. Steward testified that the '138 patent would not have been obvious in light of the Strain patent because the Strain patent did not provide direct load, and the pilot, flange, and groove configurations differed.

Mr. Steward also testified that the '138 patent was not obvious in light of the Newcomb patent because the two structures differed as to the configuration of the grooves and flanges and deformation of the pilot.

Defendant's expert testified that the claims of the '138 patent differed from the requirements of the Strain patent because the '138 patent required deformation of the nonflanged sides of the pilot.

Defendant's expert also indicated that the method of deforming the pilot in the '138 patent did not describe the claims of the Newcomb patent. Defendant's expert did testify, however, that it would have been obvious to combine the teachings of the Newcomb and Strain patents. He then stated that, if the '138 patent is read broadly enough to cover the type of corner clinching used in defendant's product, then there is no difference between the '138 pat-

ent and the combination of the Newcomb and Strain patents. Defendant's expert did not give any justification or explanation for this conclusion.

Since both experts agreed that the '138 patent does not cover the claims of the Newcomb and Strain patents, and since defendant did not offer specific facts that would show that the '138 patent was obvious in light of the prior art, the Court finds that the '138 patent is not invalid due to obviousness.

### d. The '500 Patent

Defendant contends that the '500 patent was obvious to one skilled in the art in light of the teachings of the prior art found in the Bien and Newcomb patents (patents nos. 3,229,363 and 2,750,660).

The '500 patent discloses methods for installing various shaped nuts on panels. The claimed methods include deforming the nut pilot to overlie the panel metal in the grooves. In addition, claim 1 requires displacement of the nonflanged sides of the nut to provide an enlarged nut-panel contact.

Plaintiff's expert testified that the '500 patent was not obvious in light of the Bien patent because the pilot, flange and groove configurations are not anticipated. Mr. Steward testified that the Bien patent did not suggest deformation of the nonflanged sides of the nut or the use of reentrant grooves. In addition, Steward testified that the Newcomb patent did not suggest a flush-mounted nut or deformation of the pilot to form reentrant grooves, as claimed in the '500 patent.

Defendant's expert testified that it would have been obvious to one skilled in the art at the time to combine the teachings of the Bien and Newcomb patents. Defendant admitted, however, that the combination of Bien and Newcomb does not suggest step 4 of claim 1 of the '500 patent (which requires the displacement of nonflanged portions of the nut at the pilot to provide greater nut-panel contact). Defendant also admitted that the groove shape disclosed in claim 2 of the Bien patent differed in configuration

from the groove claimed in the '500 patent. He stated that the Bien patent did not disclose an overhanging flange defining a reentrant groove as claimed in the '500 patent. He testified that the difference in groove configuration would have been obvious to a person skilled in the art because "it just seems to me if I want to get a restricted entry in the bottom of the groove with a nut such as shown in . . . the Bien patent, it could be modified . . ." (Vol. XI at 55).

On the basis of this testimony, the Court cannot conclude that the '500 patent is invalid due to obviousness. Both plaintiff's and defendant's experts agreed that the '500 patent differed in some important respects from the teachings of the prior art. Defendant's conclusion that the '500 patent was obvious in view of the teachings of the prior art is unsupported by factual explanation. Therefore, since Mr. Steward testified that the '500 patent was not obvious, the Court holds that defendant has not established its claim of invalidity by clear and convincing evidence.

## INFRINGEMENT

■ There are two methods of determining whether a patent has been infringed. First, a device can "literally" infringe the patent. To determine whether there is literal infringement, the words of the claim in the patents must be compared with the accused devices. Second, if the two products are "equivalent", there is infringement. If the accused device performs substantially the same function in substantially the same way to obtain the same result as the patented device, they are equivalent. *Armco, Inc. v. Republic Steel Corp.*, 707 F.2d 886 (6th Cir.1983); *Acme Highway Products Corp. v. D.S. Brown Co.*, 473 F.2d 849 (6th Cir.1973), *cert. denied* 414 U.S. 824, 94 S.Ct. 125, 38 L.Ed.2d 57 (1973); *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).[8]

Plaintiff's experts testified that the defendant's accused structures read literally on plaintiff's patents. They also concluded that the defendant's assemblies were equivalent to the structures that they allegedly infringed.

### a. The '747 Patent

Claim 1 of the '747 patent is set out in the margin.[9]

Plaintiff's experts testified that claim 1 of the '747 patent read literally on the defendant's nonsevered version of the Hi-Clamp nut and panel assembly. They also stated that the defendant's nonsevered version is equivalent to the '747 patent.

---

**8.** Defendant argues that, since defendant does not make nut and panel assemblies on a commercial basis, it cannot be a direct infringer of plaintiff's patents, which define completed assemblies. Defendant does, however, sell the die buttons and pierce nuts, and provides installation tooling, services, and training to its customers. Those customers do manufacture and sell complete nut and panel assemblies. Thus, even if defendant is not liable as a direct infringer, it can be liable as either a contributory infringer or for actively inducing infringement, under 35 U.S.C. § 271(b) and (c), assuming that the completed devices do in fact infringe plaintiff's patents.

**9.** Text of Claim 1 of the patent.

1. A nut and panel assembly comprising a nut and a panel, said nut having a rectangular pilot portion with flanges extending outwardly from opposed sides of said pilot portion and defining surfaces spaced below the free end of said pilot portion and means defining grooves in said surfaces adjacent said opposed sides, said means including bottom walls spaced below said surfaces, upwardly inner and outer side walls extending to said surfaces to define restricted openings along at least the length of the opposed sides of said pilot portion, said panel having aperture edges defined by piercing said panel with said nut pilot portion with a main portion of the panel bottomed on said surfaces, and first portions deformed around edges defined between said surfaces and said outer side walls in engagement with said outer side walls, and panel further having second portions between the aperture edges adjacent said opposed sides which are deformed to engage substantially the entire bottom and inner side walls of said grooves whereby to mechanically join said nut and said panels, said first panel portion and said second panel portion integral and continuous with said main panel portion.

Diagrams of plaintiff's and defendant's structures are set out in Appendix E.* It is important to note that the plaintiff and defendant differed as to what represented a typical installation of defendant's product. Both parties submitted samples of what they considered to be typical installations.

The major difference in the samples presented by each side is in the degree to which the panel metal engages the metal of the inner groove wall of the nut. A review of the testimony indicates that the varying degrees of engagement with the inner groove wall depends upon the manner in which the nut is installed. If the nut is installed in an "underhit" situation (i.e. the press height is adjusted so that the press does not close sufficiently), then the panel metal will not have a great deal of contact with the inner groove wall. If the nut is installed in an "overhit" situation (i.e. the press height is adjusted so that the press closes too far), the panel metal may have a great deal of contact with the inner groove wall. There may also be some distortion of the threads. The defendant's witnesses testified that they could not control the installations made by customers. Defendant's witnesses also testified that adequate retention could be obtained in installations in which the panel metal does not contact the inner walls of the grooves. After reviewing the testimony of the witnesses and the exhibits presented by each side, the Court concludes that it is likely that, in a typical installation of defendant's assembly, the panel metal will have some contact with the inner groove wall. The degree of engagement will differ with various installations, depending on the type of press used and the press adjustment.

Defendant claims that its product does not infringe the '747 patent because the assemblies differ in several respects.

First, defendant contends that its device differs from the '747 patent because its Hi-Clamp assembly does not *require* the panel metal to substantially engage the inner groove wall. The language of claim 1 of the '747 patent states that the panel metal is "deformed to engage substantially the entire bottom and inner side walls of said grooves, whereby to mechanically join said nut and said panels, said first panel portion and said second panel portion integral and continuous with said main panel portion."

None of the witnesses clearly defined the amount of contact that is necessary to come within the term "engage substantially". Professor Quackenbush indicated that he would find substantial engagement if the degree of contact between the panel and the inner groove wall was over half.

This Court has already found that a typical installation of the Hi-Clamp nut and panel assembly features some contact between the panel metal and the inner groove wall of the nut. The testimony indicates that the degree of contact varies with the installation; there may also be gaps in the contact between the panel and groove in any installation because the panel edges will become ragged as the die button wears. Professor Quackenbush testified that defendant's installations show some engagement of the panel with the inner wall of the pilot; he also testified that the panel engages the pilot at all four corners. (Vol. XII at 15–16).

The Court finds it unnecessary to decide whether this portion of defendant's structure literally infringes the patent. Plaintiff's patent discloses a method of attaching the nut to the panel whereby the panel metal is not severed. This attachment is accomplished through deformation of the panel metal to engage the outer groove wall and to engage the bottom and inner groove walls to some degree. It is the capturing and deformation of panel metal that makes the structure work. Defendant's device utilizes the same kind of panel deformation as its principal means of attaching the nut to the panel. The samples of defendant's device produced at trial show that the panel metal contacts the outer groove wall and then moves toward the bottom and inner groove walls. While the panel metal in defendant's installation may

---

* Appendices E1 and E2 omitted from this publication.

not engage the groove walls to the same extent as seen in plaintiff's installations, there is some contact between the panel and the inner and bottom groove walls. In both structures, the nut is retained on the panel because the panel metal is secured into the reentrant grooves of the nut by moving down the inclined outer groove walls and toward the bottom and inner groove walls. Thus, the Court finds that the two devices do the same work in substantially the same way and accomplish substantially the same result. They are therefore the same, even though they might differ somewhat in shape. *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra.*

Second, defendant contends that its device differs because the nut grooves on its assembly have only one inclined wall. Thus, the groove is defined as a half dovetail. In contrast, the grooves on plaintiff's assembly have two inclined walls; they are defined as full dovetail grooves.

The relevant portion of the claim describes the shape of the nut groove walls as follows: "upwardly inner and outer side walls ... defin[ing] restricted opening along at least the length of the opposed sides of said pilot portion." This language does not require the use of full dovetail grooves. The claim merely requires that the groove walls define a restricted opening. Defendant's expert, Professor Quackenbush, admitted that the inclination of the outer groove wall relative to the inner groove wall, as found in defendant's device, serves to restrict the opening of the groove. Therefore, the configuration of defendant's groove is encompassed within the language of claim 1 of the '747 patent.

Further, the nut grooves in defendant's device perform substantially the same function as the nut grooves in the patent. Plaintiff's expert defined that a nut in which only the outer groove wall is inclined retains significant strength of retention. (Vol. II at 103–04, ex. 46).

Third, defendant contends that its assembly differs because it includes deformation of the pilot portion of the nut to form "corner clinches" as a means of securing the nut to the panel. Defendant contends that the patent claims only one means of securing the panel metal to the nut—deformation of panel metal into the grooves. In contrast, defendant's device joins the nut to the panel both by deforming metal into the grooves *and* by deforming portions of the nut pilot. Defendant's expert testified that the deformation of the pilot to form corner clinches provides 30–40 percent of the total retention force. He stated that the retention provided by the corner clinches was *not as important* as the retention provided by deformation of the panel metal into the grooves. (Vol. X at 81–83).

The language of the patent claim does not preclude the use of corner clinches to help retention. The patent does not indicate that the deformation of panel metal into the grooves is the exclusive means of retention. "An accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent." *Acme Highway Products Corp.,* 473 F.2d at 855. Both devices utilize the same basic method of attachment. Therefore, the use of corner clinches does not prevent a finding of infringement.

Finally, defendant asserts that its device differs from plaintiff's because, after the corners are formed, the pilot portion of the nut is no longer rectangular. The patent claim describes an assembly in which the nut has a rectangular pilot portion with flanges extending outwardly from opposed sides. The defendant's nut admittedly has a rectangular pilot portion with flanges extending outwardly from opposed sides before it is assembled to the panel. During installation, however, the die button deforms the pilot portion of the nut to form the corner clinches.

The Court has already found that the defendant's device is equivalent to the patent even with the use of corner clinches. The fact that the pilot portion of the nut changes shape during installation does not change this finding. The doctrine of equivalents "does not require complete identity for every purpose and in every respect."

*Graver Tank & Mfg. Co.,* 339 U.S. at 609, 70 S.Ct. at 857.

In sum, this Court concludes that defendant's nonsevered Hi-Clamp nut and panel assembly infringes plaintiff's '747 patent under the doctrine of equivalents.

### b. *The '843 Patent*

Plaintiff contends that both defendant's severed and nonsevered nut and panel assemblies infringe the method claim of the '843 patent.

The '843 patent discloses a method of securing a pierce nut onto a panel in which the corners of the nut pilot are radiused in order to relieve stress at the sharp corners of the pilot. The method claim also states that the pierce nut used in the assembly has undercut grooves.

Plaintiff's experts testified that both of defendant's products read literally on the '843 patent and performed substantially the same function in substantially the same way. This testimony consisted of conclusions.

Defendant's expert, on the other hand, testified that the original severed version of the Hi-Clamp nut and panel assembly did not infringe the '843 patent because the nut in the Hi-Clamp assembly did not have undercut grooves. He further testified that the '843 patent was not infringed by either of defendant's products because they do not include the same type of radiusing of the nut pilot.

The Court finds that defendant's products do not infringe the method claim of the '843 patent. First, the method of changing the shape of the nut pilot in defendant's products differs from the method used in the '843 patent. The '843 patent specifies that the pilot is radiused by shearing the metal. The defendant's expert testified that the pilot in defendant's products is deformed (as opposed to sheared) and that the process of deformation is different from that of shearing. More importantly, the defendant's products do not perform the same function as the assembly created in the '843 patent. The testimony indicates that the purpose of radiusing the pilot in the '843 patent is to relieve the stress created by the sharp corners of the pilot. Although the '843 patent does not describe the shape of the pilot after radiusing, an embodiment of the claim depicts a nut pilot in which the corners are rounded. The defendant's deformation of the pilot portion of the nut does not produce rounded corners. Rather, each corner of the pilot is deformed so that it has a concave configuration. After the deformation, the pilot has eight sharp corners. While the difference in shape in and of itself does not preclude a finding of infringement, the function of the radiusing step indicates that the shape is important. Since the deformation of defendant's pilot creates sharp corners, and plaintiff's patent is designed to relieve stress by removing sharp corners, it is unlikely that defendant's process would relieve stress.

Finally, and most importantly, all of the testimony at trial clearly established that the primary purpose of deforming the pilot on defendant's assembly was to *increase retention* of the nut to the panel.

Therefore, the Court holds that the defendant's products do not perform the same, or substantially the same, function or accomplish the same result as the method claim of the '843 patent.

### c. *The '138 Patent*

Plaintiff contends that both defendant's severed and nonsevered nut and panel assemblies infringe both claims of the '138 patent.

The '138 patent discloses a method of installing a pierce nut into a panel in which the pilot punches through the panel, the panel is bottomed on the flanged sides of the nut, portions of the panel are swaged into the recesses located on the nut, and the remaining two sides of the nut pilot are staked outwardly to overlie the remaining panel portions.

Plaintiff's experts testified that both claims of the '138 patent read literally on both defendant's devices and that defendant's method of installation are equivalent to the claims in the '138 patent.

Defendant's expert testified that defendant's assemblies did not infringe the '138 patent. He admitted, however, that the method portions of the '138 patent read literally on the defendant's products except for one item: The expert felt that the deformation of the nut pilot in the '138 patent was not equivalent to the deformation of the nut found in defendant's corner clinches.

The language of claim 1 describes the nut piercing the panel, swagging the panel metal and then states that installation includes "staking outwardly the remaining two sides of the nut pilot portion to overlie the remaining panel portions."

Claim 2 describes piercing and swagging the panel and then "smoothly and continuously deforming outwardly the upper outer edges of the planar sides of the nut pilot portions to overlie the remainder of the plate portion surrounding the nut pilot portion." Defendant's expert interpreted this language to require deformation of *all* or *substantially all* of the nut pilot to overlie the panel metal. He testified that the defendant's devices did not infringe because they deform the pilot only at the corners. He based this interpretation of the claims on the use of the words "remaining" and "remainder."

The language of claim 1 of the '138 patent does not require deformation of the entire nonflanged side of the pilot as defendant claims. Rather, the word "remaining" in claim 1 seems merely to differentiate between the flanged and nonflanged sides of the nut; the word "remainder" in claim 2 seems to differentiate between the panel metal that is deformed into the grooves and the panel metal that surrounds the nonflanged sides of the nut.

The Court cannot find that the defendant's device literally infringes the patent, however, because the language of the patent requires that the nut pilot be deformed to *overlie the panel.* In contrast, defendant's expert testified, the Hi-Clamp assemblies deform the pilot so that the *panel metal overlies the nut.*

Further, the Court cannot find that the defendant's installation performs substantially the same function in substantially the same way as the claims in the patent. Plaintiff's experts merely stated the conclusion that the installations are equivalent. The testimony did not explain why they are equivalent even though there is a difference in the way the panel metal interacts with the deformation of the pilot. Therefore, since the burden is on the plaintiff to prove infringement, the Court finds that the '138 patent is not infringed by defendant's devices.

#### d. *The '500 Patent*

Plaintiff contends that both of defendant's installations infringe claim 1 of the '500 patent and that defendant's non-severed assembly infringes claim 2 of the '500 patent.

Again, plaintiff's experts testified that defendant's devices read literally on the claims and that they performed substantially the same function in substantially the same way.

The '500 patent discloses two claims in which the nut pierces the panel and portions of the panel are displaced into the nut grooves. In claim 1, the nut is deformed to overlie the groove and the metal that is displaced into the groove, and the non-flanged sides of the nut are displaced to provide enlarged nut-panel contact. In claim 2, the nut pilot is staked toward the flange portion to restrict the groove.

Defendant's expert testified that the Hi-Clamp installations did not infringe the patent because 1) they do not include a step of displacing the nonflanged sides to the nut pilot, 2) they do not stake the nut to overlie the panel metal in the groove, and 3) they do not deform the nut to the degree required by the patent.

On cross examination, defendant's expert indicated that the Hi-Clamp installations do involve some displacement of the non-flanged sides of the nut pilot that does increase panel-nut contact at the corner clinches. Further, although defendant's expert testified that the installations do not infringe the patent because the patent re-

quires the nut to be deformed to a substantial extent along the entire length of the groove, the language of the patent claim does not require that the nut be deformed along substantially its entire length. Thus, since defendant's installations do include some pilot deformation adjacent to the groove and do restrict the groove opening to some extent, they fall within the language of claim 2. Therefore, the Court concludes that defendant's nonsevered assembly infringes claim 2. The Court finds, however, that defendant's installations do not infringe claim 1 of the '500 patent because that claim requires that the nut pilot be deformed to overlie the panel metal. As noted earlier, the defendant's assemblies deform the pilot so that the panel metal overlies the nut. The plaintiff has failed to provide any factual basis for concluding that defendant's method of installation performs substantially the same function in substantially the same way.

### e. The '345 Patent—Claims 1 and 4

Plaintiff contends that defendant's original severed version of the Hi-Clamp nut and panel assembly infringes claims 1 and 4 of the '345 patent.

Plaintiff's experts testified that defendant's severed assembly read literally on the above claims. They also testified that defendant's installation performs substantially the same function in substantially the same way.

The '345 patent describes a method of making an assembly in which the nut, having a reentrant groove, pierces the panel. The panel is then bottomed on the nut shoulders; portions of the panel aligned with the groove mouth are severed. A portion of the severed panel metal is then placed into the groove and deformed so that the severed panel portions are of a width greater than the width of the groove mouth. The remainder of the severed panel metal is deformed so as to join the undeformed portions of the panel to the severed portions of the panel.

Defendant's expert testified that the Hi-Clamp assembly does not infringe claims 1 and 4 of the '345 patent for three reasons.

First, defendant contends that the assemblies differ because the patent requires that the nut have a reentrant groove and the original Hi-Clamp assembly does not have a preformed reentrant groove on the nut.

Although defendant's original Hi-Clamp nut does not have a preformed reentrant groove, portions of the groove are deformed during installation to create a restricted opening. Both defendant's and plaintiff's experts testified that reentrant grooves formed during installation perform substantially the same function as reentrant grooves that are preformed.

Thus, the fact that the defendant's Hi-Clamp nut has a rectangular groove before installation does not preclude a finding of infringement. Defendant's final assembly includes a groove having a restricted opening at the corners of the nut pilot. The function of this restricted opening is the same as the function of the reentrant groove in the patent.

Second, defendant contends that its assembly differs from the '345 patent because, during installation of the original Hi-Clamp nut, the panel is severed at the outer groove edge for the *full length of the groove.* Defendant contends that this brings its assembly outside the scope of the patent because the patent states that the severed portions of panel metal are of less *longitudinal length than the groove.*

The testimony of both plaintiff's and defendant's experts establishes that, although the panel metal in defendant's original Hi-Clamp assembly is severed for the entire length of the *outer* groove wall, it is not severed for the full length of the *inner* groove wall. In contrast, in plaintiff's assembly, the panel is severed for the entire length of the *inner* groove wall and is not severed for the entire length of the *outer* groove wall. The language of the patent does not require one configuration over the other. The testimony of plaintiff's expert, Harold Ladouceur, establishes that both methods of severing are equivalent and have the same result. Thus, they perform

substantially the same function in substantially the same manner.

Finally, defendant contends that its severing installation differs from the patent because the severed panel portions cannot be deformed to a width greater than that of the grooves since the grooves are rectangular (as opposed to reentrant). As noted above, the grooves in defendant's assembly are deformed at portions during installation to create restricted openings. Thus, defendant's installation does have reentrant grooves. When panel metal is displaced into these portions of the grooves, its width becomes greater than that of the groove openings.

Thus, claims 1 and 4 of the '345 patent define a method of installing defendant's original nut and panel assembly.

### f. The '723 Patent

Plaintiff contends that defendant's original severed nut and panel assembly infringes all of the claims of the '723 patent.[10]

The '723 patent describes an assembly in which the nut has a central pilot portion projecting through the panel. There are shoulders defining surfaces on opposed sides of the pilot; portions of the panel are bottomed on these surfaces. There are two parallel reentrant grooves; the grooves have a restricted opening. Portions of the panel are severed and displaced below the surface and deformed to a width greater than the width of the groove opening. A second portion of the panel is integral with the ends of the first severed portions and with the panel portions bottomed on the shoulders. This panel portion extends through the groove opening to join the severed portions to the rest of the panel.

. Plaintiff's experts testified that defendant's device read literally on the patent and that the assembly is equivalent to the assembly disclosed in the patent.

Defendant contends that its assembly does not infringe the '723 patent for the same reasons that it argued its assembly did not infringe the '345 patent (i.e. the panel is severed for the entire length of the groove, the panel is not displaced to a width greater than that of the opening of the groove, the nut does not have a reentrant groove). For the reasons given above in discussing the infringement of the '345 patent, the Court finds that the claims of the '723 patent are infringed by the defendant's severed Hi-Clamp nut and panel assembly. The defendant's structure features a nut with parallel grooves. When the assembly is complete, portions of the grooves have restricted openings. The nut is assembled to the panel by severing portions of the panel metal and displacing those portions into the grooves. The severed panel metal is deformed to a width greater than that of the groove openings at the corners of the pilot. The severed panel portions are attached to the remainder of the panel metal at the hemispherical upsets. While there are some differences in the structures, the defendant's device performs substantially the same function in substantially the same way as the devices claimed in the patent.

### g. The '345 Patent—Claims 2 and 5

Plaintiff contends that defendant's die button for installing the severed and integral and continuous Hi-Clamp nuts infringe the die button claims, claims 2 and 5, of the '345 patent.

Claims 2 and 5 of the '345 patent define a die button used for installing a nut having a piercing portion and reentrant grooves. The die button is described as having a planar end face with a central polygonal aperture and a plurality of elongated parallel embossments on opposite sides of the aperture. These embossments are of less length than the grooves on the nut. The embossments merge into the plane of the die button through arcuate joining surfaces. The embossments have a height slightly greater than the depth of the nut grooves, less the thickness of the sheet metal panel, and a width slightly less than the width of the grooves on the nut.

---

**10.** The testimony indicates that, if defendant's assembly infringes claim 1 of the '723 patent, it infringes all of the claims. Therefore, the Court will only discuss claim 1.

Plaintiff's experts testified that defendant's die buttons read literally on the claims and that they are equivalent to the claimed die button.

Defendant's expert testified that defendant's original die button does not fall within the claims because the die button used to install the original severed assembly did not work with a nut having reentrant grooves. The die button claim in the '345 patent clearly specifies that the apparatus is used to assemble a panel to a nut that already has reentrant grooves. Although defendant's completed installation has reentrant grooves, the grooves become reentrant during installation. Since the die button claims in the '345 patent do not describe an apparatus for forming reentrant grooves during installation, the Court concludes that defendant's original die button does not infringe claims 2 and 5 of the '345 patent.

Defendant's expert further testified that the current MacLean Fogg die button does not infringe the '345 patent because the '345 patent defines the width of the clinching lips of the die button as slightly less than the width of the reentrant groove opening. He testified that the width is such that the panel metal is severed when the clinching lips enter the groove. In contrast, the width of the clinching lips in defendant's current die button does not sever the panel; it merely deforms the panel.

All of the testimony at trial established that, in order to form a nonsevered installation—as opposed to a severed installation—the width of the clinching lips of the die button must be changed. Since the '345 patent discloses a severing installation, the Court concludes that defendant's current die button, which produces a non-severed installation, does not infringe claims 2 and 5 of the '345 patent.

### DEFENDANT'S CLAIM OF FRAUD

Defendant contends that the '747 patent is unenforceable because plaintiff breached its duty of candor and good faith to the United States Patent and Trademark Office.

To establish that a patent was procured by fraud so as to render it unenforceable "requires clear, unequivocal, and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO." *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376 (C.A.F.C.1983).

Defendant has failed to show such evidence of any misrepresentation or withholding of a material fact.

### WILLFUL INFRINGEMENT

Plaintiff claims that defendant willfully and intentionally infringed the patents and therefore an award of increased damages and attorney's fees is justified.

Under 35 U.S.C. § 285, attorney's fees may be awarded in exceptional circumstances. Exceptional circumstances exist if there is evidence of fraud, malice, or bad faith. *Deyerle v. Wright Manufacturing Co.,* 496 F.2d 45 (6th Cir.1974). The standard is one of "unfairness, bad faith, or inequitable or unconscionable conduct" on the part of the losing party. *Uniflow Mfg. Co. v. King-Seeley Thermos Co.,* 428 F.2d 335, 341 (6th Cir.1970), *cert. denied* 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970).

"Normally awards under the provision are based on the conduct of the parties, not on the quality of their proof." *Eltra Corp. v. Basic Inc.,* 599 F.2d 745, 758 (6th Cir. 1979), *cert. denied* 444 U.S. 942, 100 S.Ct. 297, 62 L.Ed.2d 308 (1979).

The Court does not feel that there is any showing of inequitable conduct or bad faith that would justify an award of attorney's fees in this case.

In addition, a plaintiff is entitled to increased damages under 35 U.S.C. § 284 if there is a finding that the infringement was willful.

"Willfulness is established only where it is shown that there was a deliberate purpose to infringe, and such a purpose is not found where the validity of the patent and any possible infringement is open to honest doubt." *Wilden Pump & Engineering Co.*

*v. Pressed & Welded Products Co.,* 655 F.2d 984, 989 (9th Cir.1981), quoting *International Mfg. Co. v. Landon, Inc.,* 336 F.2d 723, 728 (9th Cir.1964).

The testimony and exhibits in this case did not show any evidence of fraud or malice or any deliberate purpose to infringe. Defendant's witnesses testified that they had no knowledge of the '747 patent. Plaintiff did not refute this testimony. Although there is evidence that defendant knew of the other patents in suit and plaintiff alleges that defendant copied its devices, the Court feels that the questions of validity and infringement in this case were close and therefore a holding of willful infringement is not appropriate. Thus, plaintiff is not entitled to an increased damage award.

## THE UNFAIR COMPETITION CLAIM

█ Plaintiff alleges that defendant's use of the Hi-Clamp name for pierce nuts constitutes infringement of an unregistered, common law trademark (i.e. "Hi-Stress"), pursuant to 15 U.S.C. §§ 1125(a) and 1126(h).

In order to prevail on its claim of unfair competition, the plaintiff must show that there is a likelihood of confusion. *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642 (6th Cir.1982), *cert. denied* —— U.S. ——, 103 S.Ct. 231, 74 L.Ed.2d 182.

The only evidence produced at trial regarding the trademark infringement claim was a brief reference by two of plaintiff's witnesses indicating that in a few conversations, or on one instance, there was some confusion. There was no specific evidence showing that the Hi-Clamp name tended to create a false impression. There was no specific evidence of actual confusion. There was no evidence of the strength of plaintiff's mark or the likely degree of purchaser care.

Therefore, because plaintiff has failed to produce any evidence that would establish trademark infringement, it cannot prevail on this claim.

## CONCLUSION

1. All patents are valid.
2. The '843 patent is not infringed by any of defendant's products.
3. The '138 patent is not infringed.
4. Claims 2 and 5 of the '345 patent are not infringed.
5. Defendant's installations do not infringe claim 1 of the '500 patent.
6. Defendant's nonsevered assembly infringes plaintiff's '747 patent (Claim 1 is the only claim at issue in this patent).
7. Defendant's nonsevered assembly infringes claim 2 of the '500 patent.
8. Defendant's severed assembly infringes claims 1 and 4 of the '345 patent.
9. Defendant's severed assembly infringes all claims of the '723 patent.
10. There is no evidence to establish trademark infringement.

This opinion shall constitute the findings of fact and conclusions of law required by F.R.C.P. 52(a).

A judgment may be presented embodying the findings of this opinion, including an order of reference to the Magistrate for an accounting to determine damages.

APPENDIX A(1)

Plaintiff s integral and continuous
nut and panel assembly.

PATENTED MAR 14 1972

3,648,747

SHEET 1 OF 2

FIG.1a

FIG.1

FIG.3

FIG. 4

INVENTOR.
JOHN H. STEWARD.
BY
WILSON, SETTLE & BATCHELDER.

ATT'YS.

442

EXHIBIT 91

Appendix A(2)

Defendant's non-severed Hi-Clamp nut and panel assembly. (Defendant disputes the accuracy of this representation).

## INTEGRAL AND CONTINUOUS "HI-CLAMP" NUT AND PANEL ASSEMBLY

HI-CLAMP NUT

NUT AND PANEL ASSEMBLY

SECTION A-A

SECTION B-B

SECTION C-C

Appendix A(3)

Defendant's current Hi-Clamp nut.

# MAC LEAN-FOGG COMPANY CURRENT HI-CLAMP NUT

Copy of Exhibit 267

TOP VIEW

SIDE VIEW

BOTTOM VIEW

444

APPENDIX B
An enlargement of the illustration that
appeared in a Machine Design article
(Taken from Exhibit 286)

(a)

(b)

Copy of Exhibit

286

(c)

Fig. 2—Typical pierce-nut installations:
*a*, universal pierce nut with metal firmly
coined into undercuts; *b*, high-stress
pierce nut used with thin metal; *c*, pierce
nut with corners clinched against the
workpiece.

APPENDIX C

Diagram from Sheet 2, 500 Patent

Jan. 24, 1967 P. E. DOUBLE 3,299,500

METHOD OF MAKING A NUT AND PANEL ASSEMBLY

Filed Nov. 28, 1961 7 Sheets—Sheet 2

FIG.4

FIG.5

INVENTOR.
PLUMMER E. DOUBLE
BY
WILSON, SETTLE & CRAIG
ATTORNEYS

APPENDIX D1

Plaintiff's Exhibit 44
(See Footnote 6)

"HI-STRESS" PIERCE NUTS SOLD
PER VEHICLE, PER YEAR, U.S.A.

EXHIBIT 44

APPENDIX D2

Plaintiff's Exhibit 45
(See Footnote 6)

"HI-STRESS" PIERCE NUTS SOLD

PER YEAR, U.S.A.

